Filed 4/7/17

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C076938 |
| Plaintiff and Respondent, | (Super. Ct. No. CM039909) |
| v. | |
| JOSEPH ROBERT SHARPE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Butte County, Michael P. Candela, Judge.  Affirmed as modified.

C. Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Stephen G. Herndon, and Kevin M. Cornwall, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I through IV and VI.

1

Defendant Joseph Robert Sharpe, with several other men, went to someone else's marijuana garden in the night to steal the plants. Confronted by the owner, the men knocked the owner down and fled. The owner pursued until one of the men brandished a gun. A few minutes later, defendant and the other men rammed the owner's truck. Convicted of robbery and sentenced to state prison for six years, defendant appeals.

On appeal, defendant asserts the judgment must be reversed based on several arguments. We conclude those arguments have no merit.[1] Defendant also asserts that the trial court abused its discretion in making the restitution award because it awarded the victim both (1) the decrease in fair market value of the truck resulting from the damage caused by the ramming and (2) the cost to repair the truck. (See Pen. Code, § 1202.4, subd. (f)(3)(A) [allowing court to use fair market value method *or* cost of repair method to determine restitution].) We conclude that the trial court could not apply both methods because it resulted in a windfall to the victim. We also conclude that the trial court improperly calculated restitution by awarding the victim the salvage value of the truck retained by the victim.

FACTS

Jonah Smith lived on property in Butte County where he and two other people grew medical marijuana in a garden enclosed by a fence and gate. In the early morning hours of a day during harvest season, Smith was sleeping in his camp trailer next to the marijuana garden when he was awakened by noise from the garden. In the darkness, he

---

[1] Defendant contends: (1) there was insufficient evidence of robbery because there was no evidence that force or fear was used in the taking or asportation of the marijuana; (2) the prosecutor committed misconduct by misstating the law regarding robbery; (3) the trial court erred by denying defendant's Penal Code section 1118.1 motion; (4) the trial court abused its discretion by denying defendant's midtrial motion to represent himself; (5) the trial court abused its discretion by ordering too much restitution; and (6) cumulative error requires reversal.

saw four or five men in the garden. Smith went outside with his flashlight to the open gate of the marijuana garden and yelled at the men. The men in the garden ran out of the garden as Smith was running in, and Smith was knocked to the ground. The men ran down the long (about 200 feet) gravel driveway toward the road. Smith recognized one of the men as defendant and pursued him down the driveway.

Smith saw that the people running down the driveway in the darkness were carrying things, but he did not see marijuana in their hands.

While Smith was chasing defendant, another man, who was wearing a mask, came toward Smith brandishing a gun, so Smith stopped and walked quickly back up the driveway. The men who had been in the garden got into a van at the end of the driveway.

Smith got into his truck and drove to a local store. When he got there, the van that had been at his property and a white car, driven by the man who had brandished the gun at him at the property, both drove toward him and collided with his truck, disabling the truck. Smith fled to a ditch, and shots were fired at him.

When Smith returned to his property, he found that the chain on the gate at the end of the driveway had been cut. He called 911, and a deputy sheriff responded. Eleven marijuana plants had been cut down, and parts of the plants were scattered. A pile of marijuana was outside the fence of the marijuana garden. After the sun rose, Smith saw, in his words, "little pieces of marijuana cascaded down [the] driveway like bread crumbs."

At trial, defendant denied being present during the incident at the marijuana garden, but none of his contentions on appeal require us to relate the additional evidence presented of his involvement in the incident.

PROCEDURE

The district attorney charged defendant by information with one count of robbery (Pen. Code, § 211), with an allegation that defendant served a prior prison term (Pen.

3

Code, § 667.5). A jury found defendant guilty of robbery, and the trial court found true the prior prison term allegation.

The trial court sentenced defendant to five years in state prison for the robbery, with an additional year for the prior prison term. The court ordered defendant to pay $23,222.50 in restitution to Smith for damage caused, including to Smith's truck.

Additional facts and procedural history are related in the Discussion as they become relevant.

## DISCUSSION

### I

### *Sufficiency of Evidence*

Defendant contends that the evidence was insufficient to support the robbery conviction because the jury could not reasonably infer that defendant and the other men were carrying marijuana when Smith was knocked down and the gun was brandished. He claims there is no evidence of the use of force or fear when the marijuana was either taken or asported. To the contrary, the evidence is sufficient to support a reasonable inference that the men were carrying marijuana when Smith was knocked down and the gun was brandished.

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.) We must accept any reasonable inference the jury might have drawn from the evidence. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

4

Robbery requires force or fear in the taking of, or attempting to flee with, the property of another from or in the immediate presence of the victim. (Pen. Code, § 211; *People v. Pham* (1993) 15 Cal.App.4th 61, 65-66.) Force and fear are alternative elements. (Pen. Code, § 211.)

Defendant claims that, although there was evidence of the use of force (knocking Smith down) and fear (in response to brandishing of the gun), there was no evidence that defendant or his coperpetrators were in the act of taking the marijuana or attempting to flee with it when force was applied or fear was caused. We disagree. The men were in the marijuana garden cutting the marijuana. They had already stacked some of it outside the garden. When Smith confronted them, they ran out of the garden and down the driveway. In the darkness, Smith could see that they had something in their hands, yet he testified that he did not see marijuana in their hands. In the morning, Smith saw that there were pieces of marijuana scattered down the driveway. Despite Smith's inability to identify what was in the men's hands as they were fleeing, it was reasonable for the jury to infer from the circumstances that the men had marijuana in their hands. Based on this inference, there was sufficient evidence that defendant and his coperpetrators used force and fear as they took and fled with the marijuana, thus supporting a robbery conviction.

Defendant argues that "the circumstantial evidence suggested only that the perpetrators had been cutting and piling up marijuana to steal it, but from the moment Smith interrupted the theft their only aim was to get away." However, as noted above, the circumstances also suggested that the perpetrators were carrying marijuana down the driveway.

Defendant asserts that the sheriff's deputy did not see the marijuana scattered down the driveway. But Smith testified that he saw it.

Defendant also asserts that precisely where in the driveway the marijuana was found was never established. But Smith testified he saw "little pieces of marijuana cascaded down [the] driveway like bread crumbs."

5

Defendant claims that there was no evidence concerning how or when the marijuana was deposited on the driveway. But a reasonable inference from the evidence is that the marijuana on the driveway was deposited there as the men fled.

Defendant argues: "It would be rank speculation to leap from the evidence of marijuana pieces on the ground near the garden gate and plant pile (where pieces would have naturally fallen as the perpetrators hacked down 11 plants and their bamboo framing and piled up the marijuana) to the conclusion that some marijuana bits on the ground must have landed there because the perpetrators, in their rush to flee after being interrupted by Smith, were attempting to carry away marijuana but dropped some."

This argument does not give the evidence its due. Smith testified that there were pieces of marijuana scattered down the driveway. That there were also marijuana pieces by the pile of marijuana does not mean that the jury was constrained to believe that the spread of marijuana was limited to the pile by the garden or immediately around it.

Since the jury could reasonably infer that the perpetrators were carrying marijuana as Smith confronted them and chased them down the driveway, the evidence was sufficient to support the robbery conviction.

II

*Prosecutor's Argument*

Defendant contends the prosecutor committed misconduct by misstating the law concerning robbery, specifically, as to whether the use of force or fear occurred at the time of the taking or carrying away of the marijuana. We conclude the prosecutor did not misstate the law.

"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or

6

the jury.  Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.  [Citation.]"  (*People v. Morales* (2001) 25 Cal.4th 34, 44; *People v. Cash* (2002) 28 Cal.4th 703, 733.)

The trial court, here, correctly instructed the jury concerning the elements of robbery, including the following statements relevant to defendant's contention:  "To prove that the defendant is guilty of [robbery], the People must prove that . . . the defendant used force or fear to take the property or to prevent the person from resisting," and "[t]he application of force or fear may be used when taking the property or when carrying it away."

During closing argument, the defense argued that when Smith confronted the men in the marijuana patch, they fled without taking any marijuana with them, highlighting the testimony that Smith did not see marijuana in their hands and no marijuana was found in the van later by law enforcement.  Defense counsel acknowledged that there was "marijuana debris that goes down the driveway," but he did not suggest to the jury what to do with that evidence except, by implication, to urge the jury not to believe that evidence.  Defense counsel urged the jury to find that no marijuana was taken from Smith's property or presence, and thus there was no taking by force or fear.

In the rebuttal (where defendant finds fault), the following argument and other proceedings occurred.

The prosecutor argued:

"Now, [defense counsel] talked with you about the robbery instruction and the theft instruction.  Look at the two of them and compare and contrast, because they're not that different.  Because all robbery is, is theft plus force and violence.  So if there's an actual theft, and it's accomplished by means of force or violence, it's a robbery.  [¶]  Go back through the instructions and see what the force—was the force necessary to make it

7

a robbery?  Not the force that's necessary in the taking, but the force necessary for anything—for escaping.  Put it this [*sic*], let's put in an example."

At this point, defense counsel interposed an objection that the argument misstated the law.  In response to the objection, the trial court reminded the jury that, if either attorney misstated the law, the jury was required to rely on the law as stated by the court.

The prosecutor discussed each element of robbery.  In that discussion, the prosecutor said that when the perpetrators shoved Smith at the garden gate, "it was complete right there."  "It," in this sentence, may have referred to the crime of robbery or simply to the required force.

The prosecutor continued:

"I guess I'll end on another analogy.  We talked about the difference between burglary and robbery during jury selection.  Somebody walks into your house, takes your TV and walks out.  That's a burglary.  Somebody walks into your house at 4:00 o'clock in the morning, rips your TV off the wall, your brand new flat-screen panel TV off the wall, that's a burglary.

"But if you're at home, and you hear them, and you go out and try to stop them, and they push their way past you to get away, even if they drop that TV, it's a robbery.  That's where it changes.  The fact that your TV doesn't leave the house doesn't change it.  It's a robbery.  It's now elevated because of that.

"It's the same with the marijuana.  The fact that we can't prove that any of that marijuana left [Smith's] property is beside the point.  They chopped it down.  They dragged it out.  If I walked into your house and ripped your TV off the wall, it wouldn't be a defense that, 'Well, gee, I ripped the TV off the wall and then I set it down, and the TV still works.'  Because as soon as I laid hands on it, that's a theft.  As soon as I take it and I move it with the intent to permanently deprive, that's a theft.  And when I accompany that theft with force and violence, it's a robbery.  And that's what happened in this [case]."

8

On appeal, defendant argues: "Multiple times during his closing argument, [the prosecutor] suggested to the jury that any use of force or fear at any time was in itself sufficient to elevate a theft into a robbery, without regard to whether or not property was then being asported." We disagree that the prosecutor misstated the law. The statements may have been general and could have been construed in a vacuum to mean that the timing of the taking as it related to the force or fear was not important, but the prosecutor did not say that the timing was not important. For example, the analogy to taking a TV as robbery if the thief pushes the owner, even if the thief dropped the TV, does not describe when the thief dropped the TV. Therefore, it is not a misstatement of the law.

Also, it is true, as the prosecutor argued, that defendant may have been guilty of robbery even if none of the marijuana left the property. The robbery was complete if the perpetrators used force or fear while taking the marijuana or carrying it away, even if they did not succeed in getting the marijuana off the property.

Defendant argues: "[T]he prosecutor here told the jury that a robbery is merely 'theft plus force and violence.' [Citation.] He said 'force' could be the force necessary 'for *anything—for escaping*." [Citation.] He left out the critical detail that would have made this a correct statement of law: that force during an escape can elevate a theft into a robbery, but only *if* the thief was then asporting property." (Original italics.) To the contrary, the prosecutor did not misstate the law. Instead, the prosecutor said that "robbery is . . . theft plus force and violence. So if there's an actual theft, and *it's accomplished by the means of force or violence*, it's a robbery." (Italics added.)

Because the trial court correctly instructed the jury on the elements of robbery, the prosecutor's statements, even if incomplete statements of the law, were not misstatements and were not misleading, in light of the instructions. Indeed, when defense counsel objected to the prosecutor's argument as a misstatement of the law, the trial court reminded the jury to rely on the court's statements of the law. It is therefore not

9

reasonably likely that the prosecutor's statements led the jury to misapply the law. (*People v. Morales, supra,* 25 Cal.4th at p. 44.)

We conclude that the prosecutor did not commit misconduct.

Since there was no prosecutorial misconduct, we need not consider defendant's additional argument that defense counsel was incompetent if he failed to make a sufficient objection to preserve this issue for appeal.

III

*Motion to Dismiss Robbery County*

At the close of evidence, defendant moved to dismiss the robbery count. (Pen. Code, § 1118.1.) The court denied the motion.

Based on his contention that the evidence was insufficient to support the robbery conviction, defendant also contends that the trial court erred by denying his motion to dismiss the robbery count. For the same reasons discussed in part I of the Discussion, this contention is without merit.

IV

*Untimely Motion for Self-Representation*

Near the end of the prosecution's case in chief, defendant made a motion under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562] (*Faretta*) to discharge counsel and represent himself. The trial court exercised its broad discretion under the circumstances of this untimely motion and denied it. On appeal, defendant contends the trial court abused its discretion. The contention is without merit.

A criminal defendant's request to represent himself made after he "has chosen to proceed to trial represented by counsel" is "addressed to the sound discretion of the [trial] court." (*People v. Windham* (1977) 19 Cal.3d 121, 128.) Factors guiding the trial court's exercise of discretion include " '[1] the quality of counsel's representation of the defendant, [2] the defendant's prior proclivity to substitute counsel, [3] the reasons for the request, [4] the length and stage of the proceedings, and [5] the disruption or delay

10

which might reasonably be expected to follow the granting of such a motion.' " (*People v. Lynch* (2010) 50 Cal.4th 693, 722, fn. 10, disapproved on another ground by *People v. McKinnon* (2011) 52 Cal.4th 610, 637.) The wrongful denial of an untimely *Faretta* motion is subject to harmless error analysis. (*People v. Rivers* (1993) 20 Cal.App.4th 1040, 1050.)

Before defendant made his *Faretta* motion, he moved to have his court-appointed counsel replaced under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). The trial court denied the motion. Also, defendant contacted Ashley Bowles, with whom he was in a relationship and whose van he used in the robbery, and attempted to intimidate her and manipulate her testimony. Eventually, the trial court issued an order prohibiting defendant from having contact with Bowles. The court ordered that only defendant's attorney could have contact with Bowles. At trial, Bowles testified that defendant told her she should not talk to law enforcement, his freedom was up to her, he needed her help, and she should change her testimony to assist him.

The prosecution case-in-chief was nearing completion when defendant made his *Faretta* motion. Defendant said, essentially, that he disagreed with defense counsel's trial strategy and that he wanted to question Bowles further, as well as bring in other witnesses. In response to the trial court's question about whether he would need a continuance, he said that a transportation problem with one of the potential witnesses might cause a delay. The trial court denied the motion as untimely.

Later, the trial court provided additional reasons for denying the *Faretta* motion: (1) defense counsel had represented defendant well, (2) defendant made the motion because the court had denied his *Marsden* motion, thus negating the voluntary, unequivocal, and unconditional nature of the *Faretta* motion, (3) the motion was made near the end of trial, (4) granting the motion might delay the trial, which had already been delayed by the sickness of a juror, and might cause the trial to go beyond the timeframe

the jury had committed to, and (5) the *Faretta* motion was a ploy to get around the trial court's order for defendant not to contact Bowles.

On appeal, defendant claims these reasons for denying the *Faretta* motion were either unsupported or insufficient to justify exercising the trial court's discretion to deny the *Faretta* motion. However, in making this claim, he selectively attacks the court's reasons. In fact, several of the factors found by the trial court (and not effectively rebutted by defendant) supported its exercise of discretion: (1) the untimeliness of the motion, coming near the end of trial, (2) defense counsel's able representation, (3) the possibility of delay, and (4) defendant's propensity to intimidate and manipulate Bowles.

Defendant argues that the finding, based on his unsuccessful *Marsden* motion, that the *Faretta* motion was not voluntary, unequivocal, and unconditional finds no support in the record. We conclude that, even assuming this finding was not supported by the record, the lack of such record support was not enough to establish an abuse of discretion, given the other valid factors.

Defendant argues that there was no support in the record for the trial court's finding that the *Faretta* motion was a ploy to get around the order prohibiting contact with Bowles. To the contrary, defendant had already tried to manipulate her testimony, and one of his stated reasons for wanting to represent himself was to bring her back to testify, under which circumstances he would be questioning her directly and would have another chance to intimidate and manipulate her.

Finally, defendant claims that the record does not support the finding that allowing him to represent himself might delay the trial. But he stated during the hearing on his *Faretta* motion that obtaining at least one witness he desired to present might cause a delay.

We therefore conclude the trial court did not abuse its discretion in denying defendant's untimely *Faretta* motion.

12

V

*Restitution Order*

Defendant contends the trial court abused its discretion when it determined the restitution amount to Smith, awarding both the decrease in fair market value of the truck and the cost of repairing the truck. We conclude the trial court improperly awarded restitution based on both the fair market value method and the cost of repair method of determining restitution. We also conclude the trial court improperly calculated the award when applying the fair market value method.

At the restitution hearing, the prosecutor offered several documents to establish the restitution amount to Smith.[2]

First, the prosecutor introduced a letter from Smith's insurance company settling Smith's claim on the truck. According to the letter, the truck was worth $20,475.45 before it was damaged and had a salvage value of $3,250 after it was damaged.[3] Using this letter as evidence of the reduction in fair market value of the truck (prior value minus salvage value), the reduction in the fair market value of the truck as a result of defendant's crimes was $17,225.45.

Second, in the same letter, the insurance company agreed to pay Smith $1,291.91 for sales tax and $19 to obtain salvage certification from DMV. Not stated in the letter, but reflected in the total amount paid to Smith, the insurance company reduced the payout by $1,000 for the deductible Smith had on his policy.

---

[2]    Restitution of $990.41 to the victim's compensation fund for money given to Smith to pay for his broken fence was ordered but is not in dispute on appeal.

[3]    The evidence from the insurance company was considered to establish values, not as a collateral source of restitution. (See *People v. Birkett* (1999) 21 Cal.4th 226.)

13

And third, the prosecutor introduced documentation that Smith spent $1,166.67 repairing the truck, $71 for a DMV print-out, $198.47 for a rental car while the truck was not available, and $1,000 for the deductible on the insurance policy.

The trial court awarded $23,222.50 in restitution. This amount represented the sum of:

(1) $3,250 for the salvage value of the truck;

(2) $1,000 for the insurance deductible;

(3) $198.47 for rental car costs;

(4) $71 for a DMV print-out;

(5) $1,166.67 for parts to repair the truck; and

(6) $17,536.36 for the payout from the insurance company.

As noted above, the payout from the insurance company of $17,536.36 included: (1) $20,475.45 for the fair market value of the truck before defendant's crimes; (2) minus $3,250 for the salvage value of the truck because Smith retained the truck; (3) minus $1,000 for the insurance deductible; (4) plus $1,291.91 for sales tax; and (5) plus $19 for the salvage certificate fee.

At sentencing, defendant objected to inclusion of the repair costs ($1,166.67) and the salvage value of the truck ($3,250). The trial court implicitly overruled the objections by including those amounts in the restitution award.

A.     *Fair Market Value v. Cost of Repair*

The trial court has broad discretion in choosing a rational method of calculating the amount of the economic loss suffered by a victim. The goal of direct restitution is to restore the victim to "the economic status quo." (*People v. Giordano* (2007) 42 Cal.4th 644, 658, 663-664.) "A restitution order is intended to compensate the victim for its actual loss and is not intended to provide the victim with a windfall. [Citation.]" (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1172.)

14

Section 1202.4 addresses victim restitution.  It provides that the amount to be awarded as restitution when something is damaged is the replacement cost of the property or the actual cost of repairing it when repair is possible.  (Pen. Code, § 1202.4, subd. (f)(3)(A).)  Section 1202.4, subdivision (f)(3)(A) provides for restitution consisting of "[f]ull or partial payment for the value of stolen or damaged property.  The value of stolen or damaged property shall be the replacement cost of like property, or the actual cost of repairing the property when repair is possible."

Undoubtedly, the task of determining restitution is more difficult when the victim retains and repairs a salvaged vehicle because the repaired vehicle is not as valuable as the vehicle before it was damaged, as it is now salvaged and registered as such.  Under these circumstances, the cost of repair, alone, does not fully compensate the victim.  For this reason, it may be better to base restitution on the fair market value method.  In this case, there was evidence of the amount of the decrease in the value of the truck caused by defendant's crime.  That amount was $17,225.45 (the prior fair market value of the truck, minus the salvage value of the truck).  Therefore, $17,225.45 fully accounted for the damage to the truck, based on the fair market value method of determining restitution, because defendant had a truck worth $20,475.45 before the crime and was left with a truck worth just $3,250 after the crime.

The trial court based its restitution order on the fair market value method, but it abused its discretion by also awarding the cost to Smith to repair the truck, which cost was $1,166.67.  Having fully recovered the decrease in fair market value, Smith was not entitled to also recover the cost of repair because repairing the truck made it more valuable.  Put another way, before the crime, Smith owned a truck that was worth more than $20,000.  After the crime, Smith was left with a truck that was worth not much more than $3,000.  Smith was compensated for this decrease in fair market value.  However, if the truck is repaired, the value of the truck goes up, even though it does not go all the way up to the former fair market value.  Therefore, adding the cost of repair improperly

15

alters the results of the fair market value formula. For this reason, the fair market value method and the cost of repair method of determining restitution must be kept separate.

B.   *Calculation under Fair Market Value Method*

Because Smith kept the truck, the trial court also erred in its calculations when it awarded the salvage value of the truck as part of the fair market value. It would be a windfall for him to receive the salvage value of the truck from defendant and also get to keep the salvaged truck.

Before defendant's crimes, Smith's truck was worth $20,475.45. If Smith did not get to keep the truck, that amount would have been the appropriate measure for awarding the fair market value. However, because Smith kept the truck that was worth $3,250 after the crimes, defendant's crimes only cost Smith, as far as the value of the truck, $17,225.45—the difference between the value of the truck before and after the crimes. Awarding $3,250 over and above the reduction in value of the truck constituted a windfall for Smith because he retained the truck valued at $3,250.

On appeal, defendant does not contend that the $3,250 award for the salvage value of the truck was improper, even though defendant objected to that award in the trial court. He claims in his opening brief that adding $3,250 to the award was permissible because the insurance company deducted that amount from its settlement with Smith. But defendant misses the point; $3,250 was deducted from the insurance settlement because Smith retained the truck that was worth $3,250.

The trial court should have begun its calculation of restitution based on fair market value by determining the reduction in value of the truck, which truck Smith kept, instead of simply adopting the insurance company payout amount. Here, the reduction in value was $17,225.45.

One last observation concerning the trial court's award—this relating to the award to Smith of $1,000 because he had a $1,000 deductible on his insurance policy: if the trial court had started by determining the reduction in value of the truck, the $1,000 for

16

the deductible on the insurance policy would have been irrelevant because, ultimately, it is the reduction in value not the insurance payout that the court must determine.  (In effect, the trial court here subtracted $1,000 from the value of the truck by using the insurance payout amount and then added it back to the bottom line of the restitution award.)

With these principles in mind, the proper components of the restitution award, therefore, are as follows:

(1)  $17,225.45 for the reduction in value of the truck;

(2)  $198.47 for rental car costs;

(3)  $71 for a DMV print-out;

(4)  $1,291.91 for sales tax; and

(5)  $19 for the salvage certificate fees.

The total restitution award is the sum of those values:  $18,805.83.

VI

*Cumulative Error*

Having found no error except as it related to the restitution order, we need not consider defendant's argument that the cumulative effect of errors was prejudicial and should result in reversal of the judgment.

DISPOSITION

The judgment is modified by reducing the restitution award to Smith to $18,805.83.  As modified, the judgment is affirmed.  The trial court is directed to prepare

17

an amended abstract of judgment reflecting the modification and to send the amended abstract to the Department of Corrections and Rehabilitation.


                                                          NICHOLSON     , J.


We concur:


      BLEASE         , Acting P. J.


      HOCH          , J.